IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:19-cv-601

| | |
|---|---|
| TRULIANT FEDERAL CREDIT UNION,<br><br>                    Plaintiff,<br><br>        v.<br><br>SUNTRUST BANKS, INC. and BB&T CORPORATION,<br><br>                    Defendants. | **BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

## NATURE OF THE MATTER BEFORE THE COURT

Before the Court is Truliant's motion for a preliminary injunction. Truliant seeks to enjoin Defendants' use of "Truist" as a trademark during the pendency of this litigation so as to preserve the status quo, to prevent irreparable harm to Truliant through the loss of customers and erosion of the goodwill it has built in its brand over the past twenty years, and to further the public interest by preventing additional consumer confusion in the marketplace.

## STATEMENT OF FACTS

A.     Truliant's Business and Its TRULIANT Mark

Truliant is a federal credit union charted in 1952 and headquartered in Winston-Salem, North Carolina. (Dkt. 30-1, Aff. of Chris Murray ¶¶ 3-4). In 1999, Truliant developed and adopted the trademark "TRULIANT," a fanciful word with no other

meaning.  (*Id.* ¶¶ 5-6).  Truliant has continually used the mark since then.[1]  (*Id.* ¶ 7).

Following adoption of TRULIANT, Truliant applied to register the mark on the Principal

Register of the United States Patent and Trademark Office.  The application was granted,

and TRULIANT was placed on the Principal Register on March 20, 2001.  In 2006, the

mark became incontestable.  (*Id.* ¶¶ 8-9).

Since the adoption of the mark, Truliant has expended significant efforts in

advertising the mark to build Truliant's reputation and goodwill.  (*Id.* ¶ 10).  These efforts

include digital ads, print ads, in-branch ads, outdoor ads, radio ads, television ads, and

sponsorships.  (*Id.*).  Since 1999, Truliant has spent more than $45,000,000 advertising the

TRULIANT brand in the markets in which it has branches, spending on average more than

$7,500,000 per year since 2015.  (*Id.* ¶ 11).

Since adopting the TRULIANT mark, Truliant's business has thrived.  Membership

has grown from 163,000 to more than 250,000.  (*Id.* ¶ 12).  Annual deposits have grown

from $629,000 to more than $2,000,000.  (*Id.* ¶ 15).  Annual gross income has grown from

$58,000 to more than $155,000,000.  (*Id.* ¶ 16).  Annual earned media impressions (neither

paid for nor originated by Truliant) have grown from 73,000,000 to more than 200,000,000.

(*Id.* ¶ 17).

Truliant now services members through branches located in numerous counties in

North Carolina as well as parts of Virginia and South Carolina.  (*Id.* ¶ 18).  Truliant's

---

[1] Truliant uses other trademarks in connection with TRULIANT, but those marks are not
asserted as the basis for this motion for preliminary injunction.

services are open to anyone who lives, works, worships, or attends school within that geographical area.  (*Id.* ¶ 24).

Truliant offers various types of financial services, including checking accounts, savings accounts, debit cards, auto loans, mortgages, home equity lines of credit, personal loans, and financial advising.  (*Id.* ¶ 22).

B.  Defendants' Business, Merger, and Adoption of TRUIST

Defendants BB&T and SunTrust are banks that provide the same types of financial services and products as Truliant.[2]  (*Id.* ¶ 23).  Moreover, Defendants advertise and provide their financial services in the same geographic markets as Truliant.  (*Id.* ¶ 19). Accordingly, Truliant directly competes with Defendants for customers within Truliant's geographic footprint.  (*Id.* ¶¶ 25-26).  Defendants also use the same types of advertising as Truliant.  (*Id.* ¶ 27).  And like Truliant, Defendants offer their services through branches and mobile banking platforms.  (*Id.* ¶ 29).

In February 2019, BB&T and SunTrust announced that they were planning to merge into the sixth largest bank in the United States, subject to shareholder and regulatory approval.  (Dkt. 21 at 9).  On June 12, 2019, Defendants announced that, assuming shareholder and regulatory approval was obtained, the merged bank would be named "Truist."

---

[2] As discussed below, Defendants have now merged and changed their name.  The parties have agreed to cooperate to amend the caption and pleadings to reflect these corporate transactions.

C.    Defendants' Use of "Truist" Causes Consumer Confusion

Even Defendants' announcement that they planned to adopt Truist as the name of the merged bank caused confusion among consumers.   For example, Christopher Sostaita (a Truliant member) heard news reports about the merger and the proposed new name Truist.   Those news reports led Mr. Sostaita to believe that Truliant was involved in the merger.   (Dkt. 30-2, Aff. of Pastor Christopher Sostaita ¶ 5).   Another Truliant member was similarly confused by the news reports and came to his Truliant branch to voice his concern that the announced merger was going to affect his Truliant account and the staff at the branch.   (Dkt. 30-3, Aff. of Vincent Mespelt ¶¶ 2-5).

Following Defendants' announcement that they planned to name their merged bank "Truist," Truliant filed this action.   (Dkt. 1).   Truliant also commissioned Professor Nicholas M. Didow to design, conduct, and analyze consumer research to determine potential confusion in the marketplace between the parties' marks.   (Dkt. 30-4, Summary Report of Professor Didow at 3).   Professor Didow conducted two consumer studies to assess the likelihood of confusion.   (*Id.* at 4, 12).   To replicate how consumers encounter the marks in the real world, Professor Didow conducted both an online survey showing the marks in printed text and an in-person study presenting the marks orally.   (*Id.* at 6, 13-15). The online survey revealed a 37.8% net likelihood of confusion among consumers who reside in Truliant's geographical field of membership.   (*Id.* at 6-7, 24, 42).   The in-person oral study, conducted in Charlotte, North Carolina, revealed a 61.7% net likelihood of confusion.   (*Id.* at 7, 53).   Professor Didow concluded that "[t]here is a strong and

4

substantial likelihood of confusion among consumers between the existing Truliant and proposed Truist marks." (*Id.* at 8).

Following shareholder and regulatory approval, Defendants' merger was finalized on December 7, 2019. (Dkt. 21 at 4). That same day, the merged entity changed its name to Truist. (*Id.* at 15). The merged bank continues to operate under the BB&T and SunTrust brands, as Defendants have stated that the transition to the Truist brand will take approximately two years. (Press Release, Dec. 9, 2019[3]). While BB&T and SunTrust continue to do business under their existing brands, they have started to introduce the Truist name to their customers. *See* bbt.com (accessed Feb. 7, 2020); suntrust.com (accessed Feb. 7, 2020).

The similarity between Truliant and Truist has caused confusion with consumers. In addition to the confusion referenced above, this confusion has included BB&T and SunTrust customers as well as Truliant members and prospective members. For example, a BB&T customer believed that his existing account with BB&T meant that he was now a Truliant member as a result of the merger. (Dkt. 30-5, Aff. of Jafonda Johnson ¶ 2). Another BB&T customer believed that she could withdraw money from her BB&T account at a Truliant branch because she thought that BB&T and Truliant had merged. (*Id.* ¶ 3). Similarly, a SunTrust customer, believing that his SunTrust accounts were now Truliant accounts, contacted Truliant's member service department through a Facebook post; only

---

[3] Available at
https://www.sec.gov/Archives/edgar/data/92230/000119312519308844/d841243dex991.htm.

after several conversations (both online and by telephone) did he and the Truliant representative figure out that he was confused by the similarity of Truliant and Truist. (Dkt. 30-6, Aff. of Lynn Burleson ¶¶ 3-7).

## QUESTION PRESENTED

Should the Court enter a preliminary injunction to prevent irreparable harm to Truliant while the matter is pending?

## ARGUMENT

A preliminary injunction is appropriate here. Truliant has a registered, incontestable mark that is fanciful—meaning it receives the strongest type of protection available. Truliant has also expended significant amounts of money in building the reputation and goodwill of the Truliant mark, and the company has been successful in doing so. Considered as a whole, and from the perspective of a consumer, Truliant and Truist are confusingly similar, particularly since the companies offer the same services, through the same channels, and use the same types of advertising. Perhaps most importantly, Defendants' adoption of Truist has caused *actual* confusion among consumers. Truliant is likely to succeed on its claim of trademark infringement, but without a preliminary injunction it will likely suffer irreparable harm as a result of Defendants' infringement. Truliant respectfully requests that the Court enter a preliminary injunction.

## I. PRELIMINARY INJUNCTION STANDARD

Preliminary injunctions are appropriate "to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful

judgment on the merits." Fed. R. Civ. P. 65(a); *United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013).

An injunction is proper when a plaintiff establishes that 1) it is likely to succeed on the merits; 2) it is likely to suffer irreparable harm absent the requested injunctive relief; 3) equity weighs in its favor; and 4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 170-71 (4th Cir. 2019). Preliminary injunctions are particularly appropriate for trademark cases. *See, e.g.*, *Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 41 (2d Cir. 1986) ("[W]e have consistently held that a preliminary injunction should usually issue when the use of a mark creates a likelihood of confusion in the consumers' minds as to the ownership or sponsorship of a product."); *Fleet Feet, Inc. v. Nike Inc.*, -- F. Supp. 3d --, 2019 WL 6468114 (M.D.N.C. 2019) (stating that an injunction is "the standard remedy in a trademark infringement case").

## II. TRULIANT IS LIKELY TO SUCCEED ON THE MERITS

To obtain a preliminary injunction, a plaintiff "need not show a 'certainty' of success." *Lab. Corp. of Am. Holdings v. Kearns*, 84 F. Supp. 3d 447, 456 (M.D.N.C. 2015). Rather, the question is whether Truliant can demonstrate a likelihood of success on its claim for trademark infringement under the Lanham Act. The Lanham Act creates civil liability for any person who uses a word or mark in commerce that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person." 15 U.S.C. § 1125(a)(1). This statute "was enacted

in 1946 to provide government protection for trademarks by prohibiting infringements upon the rights of trademark holders." *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 167 n.3 (4th Cir. 2006).

Truliant can succeed on its claim for trademark infringement by demonstrating 1) ownership of a valid, protectable trademark and 2) Defendant's unauthorized use of an infringing mark that is 3) likely to cause confusion among consumers. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 930 (4th Cir. 1995).

### A. Truliant owns a valid, protectable trademark

By statute, registration of a trademark is "prima facie evidence of the validity of the registered mark." 15 U.S.C. § 1057(b); *see also Rebel Debutante LLC v. Forsythe Cosmetic Grp., Ltd.*, 799 F. Supp. 2d 558, 569 (M.D.N.C. 2011) (explaining that registration is *prima facie* evidence of the validity of the mark). Here, it is undisputed that Truliant has a federal registration for its mark and that the registration is incontestable. (*See* Dkt. 21 at 7-8; Dkt. 30-1 ¶¶ 8-9).

### B. Defendants have engaged in the unauthorized use of an infringing mark

Truliant has not authorized Defendants to use Truist. (*See* Dkt. 21 at 11).

### C. There is a likelihood of confusion between the marks

Likelihood of confusion involves an analysis of the following factors: (1) the strength or distinctiveness of the senior mark; (2) the similarity between the two marks; (3) the similarity of the goods or services the marks identify; (4) the similarity of the facilities the parties use; (5) the similarity of the advertising used by the two parties; (6) the

8

defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of relevant consumers. *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 660 (4th Cir. 2018); *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 463-64 (4th Cir. 1996).

"Not all of these factors will be relevant in every trademark dispute, and there is no need for each factor to support the plaintiff's position on the likelihood of confusion issue." *Variety Stores*, 888 F.3d at 660; *see also Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001) ("The importance and relevance of each factor will, of course, vary from case to case."). The "ultimate question" is whether Defendants' mark "is likely to produce confusion in the minds of consumers about the origin of the goods or services in question." *Clear Defense, LLC v. ClearDefense Pest Control of Greensboro, LLC*, No. 1:17-cv-01139, 2018 WL 5281912, at *4 (M.D.N.C. Oct. 24, 2018). Here, the relevant factors weigh strongly in Truliant's favor:

### 1. *Strength of the mark*

Strength is one the most "important" factors and is evaluated on the mark's conceptual and commercial strength. *Synergistic Int'l*, 470 F.3d at 171, 173. "Generally, the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark." *JFJ Toys, Inc. v. Sears Holdings Corp.*, 237 F. Supp. 3d 311, 334 (D. Md. 2017); *see also Christian Science Bd. of Directors of First Church of Christ v. Robinson*, No. 199CV148-T, 2000 WL 33422737, at *6 (W.D.N.C. Mar. 29, 2000) ("Where a mark is strong and distinctive, a defendant's use of a similar mark is more likely

to lead consumers to believe that the defendant is affiliated with or sponsored by the mark owners."). Here, the TRULIANT mark is strong both conceptually and commercially.

Conceptual strength of a trademark "is a function of the mark's distinctiveness." *RFE Indus., Inc. v. SPM Corp.*, 105 F.3d 923, 925 (4th Cir. 1997). Unlike descriptive or generic marks, "fanciful" marks "are inherently distinctive, and thus receive the greatest protection against infringement." *Sara Lee*, 81 F.3d at 464. TRULIANT is a made-up word "expressly coined for serving as a trademark," *id.*, and is therefore a fanciful mark. (Dkt. 30-1 ¶ 5); *see also Maaco Franchising, LLC v. Boensch*, No. 3:16-cv-155-GCM, 2016 WL 4746215, at *8 (W.D.N.C. Sept. 12, 2016); *Charlotte Chiropractic Clinic, P.A. v. Williams*, No. 3:14-cv-00585-RJC-DCK, 2015 WL 5431884, at *2 (W.D.N.C. Sept. 15, 2015).

Commercial strength is measured by analyzing things such as advertising expenditures, sales success, and unsolicited media coverage. *See JFJ Toys*, 237 F. Supp. 3d at 335. Truliant has spent more than $45,000,000 to advertise TRULIANT in its markets. (Dkt. 30-1 ¶¶ 10-11). These efforts alone demonstrate commercial strength. *See, e.g., Synergistic Int'l*, 470 F.3d at 174; *Garden & Gun, LLC v. TwoDalGals, LLC*, No. 3:08cv349, 2008 WL 3925276, at *5 (W.D.N.C. Aug. 21, 2008); *McNeil-PPC, Inc. v. Granutec, Inc.*, 919 F. Supp. 198, 202 (E.D.N.C. 1995). Further, Truliant has been successful in its marketing efforts and has grown in terms of membership and sales. (Dkt. 30-1 ¶¶ 12, 14-16). Further, an independent services company measures the number of times the public interacts with media content about the TRULIANT brand. (*Id.* ¶ 17).

According to that company, media interactions that were neither paid for nor originated by Truliant have grown by more than 184% over the past decade. (*Id.*).

Defendants' Answer suggests that TRULIANT is weak because other banks and credit unions use marks with some combination of the letters T-R-U. (*See* Dkt. 21 ¶¶ 23-24). This argument is factually and legally deficient. Factually, none of the banks or credit unions listed by Defendants has a branch in the various counties encompassing Truliant's geographical field of membership. (Dkt. 30-1 ¶ 20; Dkt. 30-7, Aff. of Tricia Beeker ¶¶ 5-28). Indeed, Defendants' Answer goes so far as to reference entities that only have branches in the Philippines or Alaska. (Dkt. 30-7 ¶¶ 13, 20).

Legally, Defendants' suggestion is incorrect because an entity using a similar mark in a different location "is not relevant to this analysis." *Select Auto Imports Inc. v. Yates Select Auto Sales, LLC*, 195 F. Supp. 3d 818, 833-34 (E.D. Va. 2016) (rejecting the defendant's reliance on other businesses using a similar mark outside the relevant geographic area); *see also Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1130 (C.D. Cal. 2001) (rejecting the defendant's reliance on 200 companies using allegedly similar marks when only two used the mark in the same industry and both were outside the relevant geographic area). Because Truliant's business is limited to a particular part of the country, "it has no reason—indeed, no grounds—to pursue businesses that operate outside its market." *Select Auto Imports*, 195 F. Supp. 3d at 834.

Because TRULIANT has strength both conceptually (in fact, the highest level of protection) and commercially in the relevant markets, this important factor weighs heavily in favor of Truliant.

2.    *Similarity of the marks*

Assessing the similarity of two marks includes the overall sight *and* sound *and* meaning of the marks. *Pngi Charles Town Gaming, LLC v. Hot Spot CT Real Estate LLC*, No. 3:18-CV-38, 2019 WL 6840760, at *5 (N.D. W. Va. Dec. 16, 2019). Importantly, the analysis is to be conducted from the perspective of consumers. *See, e.g.*, *Maaco Franchising*, 2016 WL 4746215, at *7.

Here, the similarity between the two marks is apparent. The "anti-dissection" rule "requires consideration of the marks as a whole, rather than the component parts of the marks." *Sweetwater Brewing Co. v. Great Am. Rests., Inc.*, 266 F. Supp. 2d 457, 462 (E.D. Va. 2003); *see also Variety Stores*, 888 F.3d at 664. Thus, it would be improper to focus on the mark's *non*-common components when evaluating similarity.

The dominant portion of both words (the "TRU" prefix) looks and sounds the same. "Courts are particularly inclined to find similarity between two marks when there is overlap in the marks' dominant portions, even if the marks contain other dissimilar words." *Pngi Charles Town Gaming*, 2019 WL 6840760, at *5; *see also JFJ Toys*, 237 F. Supp. 3d at 336 (citing examples). Thus, although not identical, the two marks are similar. *See Synergistic Int'l*, 470 F.3d at 169 (affirming similarity between "Glass Doctor" and "the

12

Windshield Doctor"); *Sara Lee*, 81 F.3d at 465 (affirming similarity because "L'eggs and the first syllable of Leg Looks are quite similar").

Given that the analysis requires the Court to assess similarity from the perspective of consumers, Professor Didow's survey work is also insightful and compelling evidence. In addition to the statistical results of his surveys discussed below, the report includes comments from the participants. Not only were participants asked whether they would believe services provided under the Truliant and Truist brands were likely being put out by the same or affiliated companies, they were asked why they answered the questions how they did. A small sampling of the comments include: "because the names are very similar"; "they sound very similar"; "the names sound the same"; "names are too similar"; "very similar names"; and "the similarities in the names." (*See* Dkt. 30-4 at 17-19, 49-50). Even many of the respondents who answered the questions in the negative noted that the marks are similar. (*Id.* at 19-20, 32-34, 50).

Defendants' Answer notes that Truliant has three syllables while Truist has two. (Dkt. 21 at 4). Yet, absolute similarity "is not required for a finding of likelihood of confusion; all that is necessary is enough similarity between the marks to confuse consumers." *Wash. Speakers Bureau, Inc. v. Leading Auths., Inc.*, 33 F. Supp. 2d 488, 497 (E.D. Va. 1999), *aff'd*, No. 99-1440, 2000 WL 825881 (4th Cir. June 27, 2000) (per curiam). Truliant has demonstrated as much here.

Defendants' Answer also notes that they have adopted a logo that is not similar to Truliant's logo. (Dkt. 21 at 5-6). However, that argument misses the point. Truliant's

13

claims are based on Defendants' infringement of its word mark "TRULIANT." Truliant has not brought suit for infringement of its logo. Moreover, the instances of actual confusion rebut Defendants' contention that the marks are sufficiently dissimilar so as to not cause confusion in the marketplace.

Further, "[t]he dominant feature of a trademark is whatever is most noticeable in actual conditions." *Variety Stores*, 888 F.3d at 664. In other words, the analysis "cannot rest solely upon a 'side-by-side' comparison of the marks." *What-A-Burger of Va., Inc. v. Whataburger, Inc. of Corpus Christi, Tex.*, 357 F.3d 441, 450 (4th Cir. 2004); *see also Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654, 660 (4th Cir. 1996) (explaining that visual dissimilarity "does not lead to the inescapable conclusion that there is no likelihood of confusion"). In fact, it would be "inappropriate to focus on minor stylistic differences in determining the likelihood of confusion caused by the defendants' use of the allegedly infringing mark, especially since consumers do not have the opportunity to view the marks side-by-side." *Porter*, 2007 WL 2316823, at *8. Under the proper rubric, Truist and Truliant are similar marks.

### 3. *Similarity of goods and services*

"Where the Plaintiff and Defendant provide the same services, the factor weighs heavily in favor of a likelihood of confusion." *Nationstar Mortg., LLC v. Ahmad*, 155 F. Supp. 3d 585, 591 (E.D. Va. 2015). On this factor, "[t]he Fourth Circuit focuses on whether the goods serve the same purpose and if the purposes are related." *Teaching Co. Ltd. P'ship v. Unapiz Entm't, Inc.*, 87 F. Supp. 2d 567, 582 (E.D. Va. 2000). Thus, "subtle differences"

14

are insignificant. *Id.* There merely must be "some degree of overlap." *JFJ Toys*, 237 F. Supp. 3d at 338.

Truliant and Defendants offer the same financial services in the same geographical areas (meaning that Defendants subsume Truliant's geographic footprint). Both offer checking accounts, savings accounts, debit cards, auto loans, mortgages, home equity lines of credit, personal loans, and financial advising. (Dkt. 30-1 ¶¶ 22-23).

Defendants' Answer notes that Defendants are not a credit union and that Truliant is not a bank. However, this is a distinction without a difference for purposes of similarity of the goods and services provided. The question is whether the goods and services provided by the two companies "serve the same purpose." *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th Cir. 1984). While credit unions have members rather than customers and shareholders, credit unions and banks provide the same goods and services and compete for the same consumers. Courts have recognized that entities offering similar financial services—even if one is a credit union and the other is a bank—can engage in trademark infringement. *See Oriental Fin. Grp., Inc. v. Cooperativa de Ahorro y Credito Oriental*, 698 F.3d 9 (1st Cir. 2012); *Red River Bancshares, Inc. v. Red River Emp's Fed. Credit Union*, No., 17-1370, 2019 WL 4727857 (W.D. La. Sept. 26, 2019).

The geographic proximity between the two companies makes the similarity even more prominent. *See Select Auto Imports*, 195 F. Supp. 3d at 836. Here, Truliant's branches are located in portions of North Carolina, South Carolina, and Virginia. (Dkt. 30-7 ¶ 4). Defendants have branches, which they intend to brand as Truist, in every market

15

where Truliant has branches. (Dkt. 30-1 ¶ 19). Given that Truliant and Defendants provide the same goods and services in the same geographic markets, the opportunity and likelihood of confusion resulting from Defendants' adoption of a similar mark is high. Therefore, this factor weighs in favor of Truliant.

4. *Similarity of facilities*

"[T]he likelihood of confusion may also be increased if both goods are sold in the same channels of trade." *JFJ Toys*, 237 F. Supp. 3d at 338. When two entities operate similar establishments and directly compete in overlapping markets, this factor weighs in favor of the senior mark holder. *Variety Stores*, 888 F.3d at 664-65. Again, "the geographic proximity of the businesses may weigh toward a finding that facilities are similar." *Pngi Charles Town Gaming*, 2019 WL 6840760, at *6.

As explained above, Truliant's geographic market is subsumed within Defendants' footprint, and the purpose of the two are similar. Both companies offer their services through branches and mobile banking platforms. (Dkt. 30-1 ¶ 29). This complete overlap in channels of trade weighs in favor of Truliant.

5. *Similarity of advertising*

"A finding of similarity of advertising requires some degree of overlap among the parties' outlets and customer bases, but the two need not be identical." *Select Auto Imports*, 195 F. Supp. 3d at 837 (internal quotation omitted). For example, similar advertising can include two entities that both offer their goods and services online. *Tropical Nut & Fruit*

16

*Co. v. Forward Foods, LLC*, No. 3:13-cv-131, 2013 WL 2481521, at *3 (W.D.N.C. June 10, 2013).

Here, both companies advertise through digital ads, print ads, in-branch ads, outdoor ads, radio ads, television ads, and sponsorships. (Dkt. 30-1 ¶¶ 10, 27-28). There is a "basic similarity" between the companies' advertising, *see Wash. Speakers Bureau*, 33 F. Supp. 2d at 500, and therefore this factor weighs in favor of Truliant as well.

6. *Defendants' intent*

Defendants' intent has not been definitively established yet, but Defendants have admitted that they had actual knowledge of TRULIANT when creating and rolling out Truist. (Dkt. 21 at 9). Such actual knowledge supports a finding of intent to infringe.[4] *Variety Stores*, 888 F.3d at 665; *Christian Science Bd. of Directors*, 2000 WL 33422737, at *8. Indeed, a "second comer" with knowledge of a senior mark "has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer." *Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 165 (4th Cir. 1990); *see also Teaching Co.*, 87 F. Supp. 2d at 583 ("The law provides that a junior user of a mark has an affirmative duty to select a mark that is not confusing.").

7. *Actual confusion*

As with the strength of the mark, actual confusion is an important factor in the analysis. The Fourth Circuit has explained: "If the strength of the senior mark is the alpha

---

[4] Notably, a senior mark holder need not establish bad faith on the part of a defendant. *Lone Star*, 43 F.3d at 937; *Pizzeria Uno*, 747 F.2d at 1535.

of infringement analysis, then evidence of actual confusion is surely the omega." *Sara Lee*, 81 F.3d at 467. Thus, although actual confusion is never required, it is powerful evidence relating to a likelihood of confusion. *Variety Stores*, 888 F.3d at 665-66; *see also Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 423 (4th Cir. 1998) (noting that "the best evidence of likely confusion is actual confusion"); *Tools USA*, 87 F.3d at 660 ("Evidence of actual customer confusion is patently the best evidence of likelihood of confusion.") (internal quotation omitted).

"Actual confusion can be demonstrated by anecdotal and survey evidence." *Pngi Charles Town Gaming*, 2019 WL 6840760, at *8. Here, Truliant's motion is supported by both. When Defendants announced that they planned to adopt Truist as the brand for their merged bank, subject to shareholder approval, confusion immediately ensued and resulted in Truliant members believing that Truliant was going to be involved in the merger. (Dkt. 30-2, 30-3). And following approval of the merger and name change in December 2019, consumers have again been confused. (Dkt. 30-5, 30-6). Instances of confusion include not only members of Truliant, but also customers of BB&T and SunTrust, and this confusion occurred even before Defendants converted a single branch to the Truist brand.

Professor Didow's survey is also strong evidence of actual confusion. *See, e.g.*, *Ga. Pac. Consumer Prods., LP v. Von Drehle Corp.*, 618 F.3d 441, 454-55 (4th Cir. 2010). His online survey showed a 37.8% likelihood of confusion among consumers in Truliant's geographic footprint and his in-person, oral survey showed a 61.7% likelihood of confusion. (Dkt. 30-4 at 6-7, 24, 42, 53). These results far exceed the level of confusion

recognized as significant in other cases. *See, e.g.*, *Mut. of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400 (8th Cir. 1987) (explaining that a survey finding 10% confusion "should be given substantial weight"); *Exxon Corp. v. Tex. Motor Exchange of Houston Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (explaining that 15-23% confusion "constitutes strong evidence indicating a likelihood of confusion");.

Because there is evidence of actual confusion, the inquiry should "end[ ] almost as soon as it begins." *Sara Lee*, 81 F.3d at 467. Far beyond showing a *likelihood* of a likelihood of confusion, *see Rebel Debutante*, 799 F. Supp. 2d at 570, Truliant has shown *actual* confusion. This factor weighs heavily in Truliant's favor.

### 8. *Quality of Defendants' product*

This factor is not relevant here, as it applies to "cheap copies or knockoffs of a competitor's trademark-protected goods." *Sara Lee*, 81 F.3d at 467.

### 9. *Sophistication of consumers*

Sophistication of consumers is a factor only when the relevant market is not the public in general. *Id.* Here, Truliant markets its services to members of the public in general, regardless of their sophistication. (Dkt. 30-1 ¶ 24). But even if this factor were relevant, the consumer in question is the "ordinary consumer." *Lone Star*, 43 F.3d at 933. When the "ordinary" consumer encompasses a wide range, sophistication is analyzed from the perspective of the least sophisticated consumer. *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 293 (3d Cir. 1991); 4 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 23:100 (4th ed. 2017). Although financial services entail some

19

sophisticated consumers, they also include non-sophisticated consumers.  (*See* Dkt. 30-1 ¶ 13).  This factor is therefore neutral or weighs in favor of Truliant.  *See Teaching Co.*, 87 F. Supp. 2d at 585 (finding this factor to be irrelevant because there was no evidence that the consumers were "highly-trained professionals or experts").

On balance, the relevant factors weigh in favor of Truliant and demonstrate a likelihood of confusion for purposes of this motion for preliminary injunction.  Again, at this point Truliant only needs to demonstrate a likelihood of success on the merits.  "If the use of the contested mark is likely to cause such 'likelihood,' the owner of the registered trademark is entitled to relief."  *Pizzeria Uno*, 747 F.2d at 1527.

## III.    TRULIANT WILL LIKELY SUFFER IRREPARABLE HARM

A likelihood of irreparable harm is one that "rises above the threshold of mere possibility."  *Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 263 (4th Cir. 2017).  When monetary damages are difficult to ascertain or are inadequate, a party establishes irreparable harm.  *Lab. Corp. of Am.*, 84 F. Supp. 3d at 463. In the trademark context specifically, "the likelihood of confusion of the public from infringement and the difficulty in proving loss of profits" constitutes a showing of irreparable harm.  *Selchow & Righter Co. v. McGraw-Hill Book Co.*, 580 F.2d 25, 28 (2d Cir. 1978).

Thus, as the Fourth Circuit has explained, "irreparable injury regularly follows from trademark infringement."  *Lone Star*, 43 F.3d at 939.  Indeed, these types of violations often cannot be compensated by money damages alone.  *Bowe Bell & Howell Co. v. Harris*,

20

145 F. App'x 401, 403-04 (4th Cir. 2005) (per curiam); *George Sink, P.A. Injury Lawyers v. George Sink II Law Firm LLC*, 407 F. Supp. 3d 539, 559 (D.S.C. 2019).

For that reason, "[i]n trademark infringement cases, a presumption of irreparable injury is generally applied once the movant has demonstrated a likelihood of confusion because of the inherent injury to goodwill and the reputation of the moving party." *ICENY USA, LLC v. M&M's, LLC*, -- F. Supp. 3d --, 2019 WL 5082603 (D. Md. 2019) (internal quotation omitted); *see also, e.g.*, *Mayson-Dixon Strategic Consulting, LLC v. Mason-Dixon Polling & Strategic Consulting, Inc.*, 324 F. Supp. 3d 569, 580 (D. Md. 2018); *Rainbow Sch., Inc. v. Rainbow Early Educ. Holding LLC*, No. 5:14-CV-482-BO, 2015 WL 333014, at *2 (E.D.N.C. Jan. 26, 2015).

Because Truliant has shown a likelihood of success on the merits, further proof of irreparable harm is unnecessary. "[T]rademark infringement amounts to irreparable injury as a matter of law." *S&R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir. 1992); *see also Int'l Kennel Club, inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir. 1988) (explaining that "the damages occasioned by trademark infringement are by their very nature irreparable"). "This is so because a remedy at law for consumer confusion or reputational damage is ordinarily inadequate, given the potential difficulty of proof of plaintiff's damages and the impairment of intangible values." *Boulan S. Beach Master Ass'n v. Think Props., LLC*, 617 F. App'x 931, 934 (11th Cir. 2015) (per curiam) (internal quotations omitted).

But the Court need not rely solely on the presumption, because potential loss of customers and loss of goodwill also constitute irreparable harm. *Signature Flight Support Corp. v. Landow Aviation ltd. P'ship*, 442 F. App'x 776, 784-85 (4th Cir. 2011). The same is true in the trademark context. *See, e.g.*, *AECOM Energy & Constr., Inc. v. Morrison Knudsen Corp.*, 748 F. App'x 115, 119 (9th Cir. 2018). Thus, "[w]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Fleet Feet*, -- F. Supp. 3d --, 2019 WL 6468114; *see also Dynamic Aviation Grp. Inc. v. Dynamic Int'l Airways, LLC*, No. 5:15-CV-00058, 2016 WL 1247220, at *28 (W.D. Va. Mar. 24, 2016) ("The loss of goodwill or industry reputation is a well-recognized basis for finding irreparable harm.") (internal quotation omitted). Defendants' use of Truist is likely to cause irreparable harm to the customer base and goodwill that Truliant has spent time and money developing. *See Atl. Pinstriping, LLC v. Atl. Pinstriping Triad, LLC*, No. 3:16-CV-547-GCM, 2016 WL 5376294, at *6 (W.D.N.C. Sept. 23, 2016) (granting injunctive relief when the plaintiffs showed that their goodwill would be damaged).

## IV.   EQUITY AND THE PUBLIC INTEREST FAVOR TRULIANT

There is no harm to Defendants that would outweigh the potential harm to Truliant. *See Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 367 (4th Cir. 2019). Indeed, any harm to Defendants would be "self-inflicted" and a "predictable consequence" of their choice to use Truist and their choice to proceed to seek shareholder approval for the proposed name with full knowledge of this pending suit and

the relief sought.  *See ICENY USA*, -- F. Supp. 3d --, 2019 WL 5082603; *Atl. Pinstriping*, 2016 WL 5376294, at *6; *Rainbow Sch.*, 2015 WL 333014, at *2.  Equity "demands that [Defendants] not be allowed to so profit from [their] apparent infringement."  *De Simone v. VSL Pharm., Inc.*, 133 F. Supp. 3d 776, 801 (D. Md. 2015).

An injunction would not affect the merger (which has already been consummated) or the ability of the merged entity to do business under Defendants' legacy brands—it would only preclude the use of Truist while this litigation proceeds.  *See, e.g.*, *Hyperheal Hyperbarics, Inc. v. Shapiro*, No. RDB-18-1679, 2018 WL 4257331, at *10 (D. Md. Sept. 6, 2018) (granting an injunction when it did not prohibit the defendant from working but merely prohibited him from using the plaintiff's mark).  When an accused infringer is still able to pursue its business, the purported harm from an injunction does not outweigh the irreparable harm suffered by a plaintiff.  *See, e.g.*, *Potomac Conference Corp. of Seventh-Day Adventists v. Takoma Acad. Alumni Ass'n*, No. DKC 13-1128, 2014 WL 857947, at *21 (D. Md. Mar. 4, 2014).  In this case, Defendants are still doing business under their legacy brands, and an injunction would not prevent them from continuing to do so.

Moreover, when a defendant is new to using a confusing mark, the balance of equities tips in the senior mark holder's favor.  *Mayson-Dixon*, 324 F. Supp. 3d at 581; *La Michoacana Nat., LLC v. Maestre*, No. 3:17-cv-00727-RJC-DCK, 2018 WL 2465478, at *3 (W.D.N.C. June 1, 2018).  Since the purpose of an injunction is to prevent irreparable harm to the senior mark holder, respecting that mark during the pendency of the litigation is appropriate.  *Charlotte Chiropractic*, 2015 WL 5431884, at *3; *Diamonds Direct USA,*

*Inc. v. BFJ Holdings, Inc.*, 895 F. Supp. 2d 752, 762 (E.D. Va. 2012). This rule is particularly appropriate when one party has obtained a federal registration for its mark. *Tropical Nut, LLC*, 2013 WL 2481521, at *4.

On the other hand, the public would be harmed if an injunction does not issue. "[T]he public's interest underlying the prohibition of trademark infringement is to prevent consumer confusion and deception." *Volvo Car Corp. v. Unincorporated Ass'ns Identified in Schedule A*, No. 1:18-cv-977, 2018 WL 4473583, at *2 (E.D. Va. Sept. 18, 2018). Because trademark infringement by its very nature deceives the public, the public has an interest "in making the misconduct unprofitable." *Id.* "In a service mark case such as this one, public interest is most often a synonym for the right of the public not to be deceived or confused." *Potomac Conference Corp.*, 2014 WL 857947, at *21 (internal quotation omitted). This "foremost public policy aim of trademark protection" is served by an injunction. *Diamonds Direct*, 895 F. Supp. 2d at 762. Because Truliant has demonstrated not only a likelihood of confusion but actual confusion as well, public interest dictates that an injunction is appropriate.

An injunction also serves the public interest when it preserves a plaintiff's statutory rights. *See, e.g.*, *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 707 (4th Cir. 2019). This is particularly true for trademark rights, because "[t]here is a strong public interest in preventing trademark infringement." *Rebel Debutante*, 799 F. Supp. 2d at 581; *see also George Sink, P.A.*, 407 F. Supp. 3d at 560 (explaining that "preventing trademark

infringement is in the public interest" because of "the unique role that trademarks play in protecting society and guiding consumers").

**CONCLUSION**

For these reasons, Plaintiff respectfully requests that its motion for preliminary injunction be granted.

This the 7th day of February, 2020.

/s/Richard A. Coughlin
Richard A. Coughlin (NC Bar No. 19894)
Kimberly B. Gatling (NC Bar No. 27234)
Kip D. Nelson (NC Bar No. 43848)
FOX ROTHSCHILD LLP
300 N. Greene Street, Suite 1400
Greensboro, NC  27401
Telephone:  336.378.5397
Facsimile:  336.378.5400
rcoughlin@foxrothschild.com
kgatling@foxrothschild.com
knelson@foxrothschild.com

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.3(d), this is to certify that the foregoing brief contains less than 6,250 words (excluding the caption, signature lines, and this certificate) as reported by the word processing software.

This the 7th day of February, 2020.

/s/Richard A. Coughlin
Richard A. Coughlin